## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 27 2017, 10:06 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jerry Drook
Marion, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Marjorie Newell
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of L.S. (Minor Child)

J.S. (Mother),

*Appellant,*

v.

The Indiana Department of Child Services,

*Appellee.*

April 27, 2017

Court of Appeals Case No. 27A02-1609-JT-2282

Appeal from the Grant Superior Court

The Honorable Dana J. Kenworthy, Judge

Trial Court Cause No. 27D02-1511-JT-22

**Pyle, Judge.**

# Statement of the Case

J.S. ("Mother") appeals the involuntary termination of her parent-child relationship with her son, L.S. Mother argues that the Indiana Department of Child Services ("DCS") did not present sufficient evidence proving that there was a reasonable probability that the conditions that resulted in L.S.'s removal from or reasons for placement outside the home would not be remedied. She also argues that DCS did not present sufficient evidence to show that the continuation of the parent-child relationship posed a threat to the child's well-being. Concluding that there was clear and convincing evidence to support the termination of Mother's parental rights, we affirm the trial court's judgment.

We affirm.

# Issue

Whether there was clear and convincing evidence to support the termination of Mother's parental rights to L.S.

# Facts

L.S. was born in August 2007. DCS became involved with Mother and L.S. on December 9, 2011, after receiving a report regarding poor living conditions at Mother's home. The prior day, the Marion Police Department ("the police") had gone to Mother's house after receiving a report that L.S.'s father ("Father") had died in the family's house. Upon arriving at the house, the police had found the house filled with piles of trash, food, clothing, rodents, and rodent excrement. The house was later condemned and torn down by the city.

[4]     During DCS's initial interview with Mother, the DCS caseworker noticed that four-year-old L.S. seemed to have some developmental delays, including an inability to verbally communicate and a lack of eye contact. Mother was aware that she should have had L.S. tested for autism, but she had never had an evaluation performed. Mother also told DCS that she had various medical conditions that made it difficult for her to maintain her house.[1] Mother agreed to have L.S. evaluated to determine his needs, and she agreed to participate in recommended services.

[5]     At that time, DCS left L.S. in Mother's care and placed her on a six-month Informal Adjustment program. As part of this Informal Adjustment program, Mother was required to do the following: keep in contact with the DCS family case manager ("FCM"); allow the FCM to visit Mother's home to monitor compliance; provide appropriate care for L.S. and ensure that he was attending services and school; meet all of L.S.'s medical and mental health needs; provide L.S. with a safe home environment; participate in an intensive family preservation program; complete a parenting assessment and follow all recommendations; and complete a psychiatric evaluation and follow all recommendations.

[6]     During the Informal Adjustment period, DCS assisted Mother with having L.S. evaluated, and he was diagnosed with autism. After being diagnosed, L.S. started to receive services, such as occupational, physical, and speech therapies.

---

[1] For example, Mother had back pain, kidney problems, high blood pressure, and fibromyalgia.

In March 2012, L.S. began to receive Social Security disability benefits. DCS provided services to aid Mother in obtaining suitable housing and meeting L.S.'s special needs. Specifically, Melissa Helton ("Helton") provided home-based services to Mother and worked with her on finding a job, obtaining housing, and parenting a child with special needs. Helton met with Mother on a weekly basis.

[7] Mother was generally compliant with services, such as participating in home-based services and completing her psychiatric evaluation and parenting assessment. Nevertheless, DCS continued to have concerns about Mother's supervision and care of L.S. Additionally, Mother had not provided a stable home environment, as Mother and L.S. had been living in a shelter since the beginning of the Informal Adjustment period. Also, Mother had not obtained employment and had no source of income other than L.S.'s disability benefits. At times, she had difficulty budgeting these funds.

[8] By May 2012, Mother had not yet completed the requirements of the Informal Adjustment program, and DCS had continued concerns about Mother's care and supervision of L.S. For example, service providers who provided home-based services reported that Mother was frequently lying around, was feeding L.S. only junk food, was not bathing him regularly, was allowing him to wander around, and was not working with L.S. on his therapeutic skill-building activities. L.S.—who was almost five years old—was still not potty-trained, could not speak, and did not know how to use utensils to eat. DCS was also concerned about Mother's apparent lack of motivation to budget her money

and move out of the shelter, despite the assistance that service providers had offered. DCS requested to extend Mother's Informal Adjustment program for an additional three months, and the trial court granted DCS's request.

[9] Prior to the expiration of the Informal Adjustment extension, DCS filed a petition alleging that L.S. was a child in need of services ("CHINS") in August 2012. In the petition, DCS alleged, in part, that Mother was not consistently supervising L.S. or working with him to help him with his autism; was unable to provide housing and had been living in a shelter with L.S.; and had failed to follow up on recommendations from her parenting assessment and psychiatric evaluation and seemed unmotivated to do so. The trial court then appointed a court-appointed special advocate ("CASA") to represent L.S.'s best interests.

[10] During the CHINS hearing held in November 2012, Mother admitted that L.S. was a CHINS and that she needed assistance in providing for his needs. The trial court determined that then five-year-old L.S. was a CHINS and allowed him to stay in Mother's care. At that time, Mother had just moved out of the shelter and into an apartment. The trial court ordered that L.S. was to continue receiving physical, occupational, and speech therapies. The trial court also ordered Mother to, among other things: maintain safe and appropriate housing; cooperate and maintain contact with DCS and service providers; continue home-based services; allow DCS to make unannounced visits to her home to ensure the safety of L.S.; secure and maintain a stable source of income; ensure that L.S. was enrolled in and attending school; meet L.S.'s medical and mental health needs in a timely manner; obey the law; and

continue to actively participate in home-based services, parenting education, and counseling.

[11] A few months later, in February 2013, DCS removed L.S. from Mother's care on an emergency basis due to her lack of appropriate supervision of L.S. and failure to meet his needs. Specifically, on two occasions, Mother had failed to answer the door when the school bus driver brought L.S. home and to the door, resulting in L.S. being taken back to school. Mother told DCS that she had taken some cold medicine and did not wake up. DCS placed L.S. in relative care and later in foster care. DCS allowed Mother to continue to receive payment of L.S.'s disability benefits, which were her only source of income, so that she could use it to work toward reunification with L.S.

[12] Thereafter, Mother was compliant with services, attended her visits with L.S., worked on skill-building activities with L.S., moved into an apartment and child-proofed it for L.S., and cooperated with DCS. Mother also attended individual therapy and participated in home-based services to work on parent education, budgeting, and nutrition. Helton, the home-based services provider, noted in an April 2013 monthly progress report that Mother was willing to work with services, had gotten housing and kept it clean, had been working with L.S. on his therapy tasks, and was doing well in her supervised visits.

[13] In late May 2013, DCS returned L.S. to Mother's care, and the CHINS case remained open with all previous services and requirements in place. At that time, Mother agreed to set up a safety plan for L.S., which was set up to address

DCS's ongoing concerns regarding Mother's care of L.S. The safety plan included obtaining safety equipment for Mother's apartment, keeping the bathroom door closed so that L.S. would not get into the toilet water, putting a deadbolt on the top of the front door so that L.S. could not leave the apartment alone, supervising L.S. at all times, ensuring that he attended school and all therapies, and working with L.S. on skill-building activities.

[14] However, thereafter Mother did not consistently take L.S. to his required therapy appointments. Also, Mother was living with a woman, T.K., who had a DCS case of her own. DCS told Mother that T.K. was not an appropriate person to be living in the same home as L.S. and warned Mother that T.K. should not live with Mother because Mother was the only person on the lease. Also, T.K. interfered with the home-based services provider's ability to work with Mother.

[15] Nevertheless, DCS continued to recommend that L.S. remain in Mother's care. Following a permanency hearing in August 2013, the trial court accepted DCS's recommendation but noted that it had "serious reservations regarding continued placement with Mother." (Ex. Vol. 61). The trial court conditioned this continued placement on Mother's compliance with the requirements that she keep all appointments for L.S., not unilaterally stop services, and get T.K. to move out of her apartment.

[16] Mother had T.K. move out of the apartment in September or October 2013. Mother did better with home-based services after T.K. moved out. However,

Mother continued to be unemployed and continued to have difficulties budgeting funds. In January 2014, she was evicted from her apartment for failing to pay her rent. Thereafter, she moved into another apartment.

[17] In March 2014, the trial court held a periodic hearing and, thereafter, removed L.S. from Mother's care due to her failure to comply with L.S.'s case plan and to ensure that he received his necessary therapies. L.S. never returned to Mother's care. The trial court found that "Mother's excuses for lack of compliance with [L.S.'s] services [were] not credible" and stated that her "efforts in this matter [were] minimal." (Ex. Vol. 63). After L.S. was removed from Mother's care, DCS placed him in therapeutic foster care and stopped L.S.'s disability benefits from going to Mother. DCS provided Mother with visitation, individual therapy, and home-based services to assist her with obtaining employment and housing.

[18] Thereafter, Mother had supervised visitation with L.S. Additionally, Mother participated in services and sought out some services on her own, including individual counseling and nutritional consulting. DCS had concerns about Mother because she participated in services but did not seem to make any concrete progress. Mother still had no employment and no source of income. She had applied for Social Security on her own behalf but was denied benefits. Also, Mother was charged with two crimes, including a "hit and run" and theft from a Walmart. (Vol. 2 Tr. 250).

[19]  Following a February 2015 permanency hearing, the trial court issued an order, noting that Mother had been participating in services and supervised visitation but that she was "unable to demonstrate that she ha[d] received maximum benefits of services with regard to providing a stable environment for [L.S.]." (Ex. Vol. 74). The trial court also approved DCS's plan to move towards termination of parental rights. DCS continued to provide the same services to Mother.

[20]  In the subsequent months, Mother continued the same pattern of attending services but failing to get the maximum benefit from them. Mother continued to have supervised visitation with L.S., but she would occasionally doze off for short periods during those visits. She also fell asleep for longer periods of time during visits. For example, during a June 2015 visit, Mother fell asleep for almost thirty minutes. While Mother was sleeping, L.S. walked around the room, took chalk from the chalkboard, and put it in his mouth. Mother also did not show up for all visitation sessions. Additionally, she did not obtain employment and was unable to provide a stable environment for L.S.

[21]  On December 14, 2015, DCS filed a petition to terminate Mother's parental rights to L.S. At that time, Mother did not have employment or housing of her own and was living in T.K.'s apartment. DCS continued to provide Mother with services and visitation with L.S.

[22]  The trial court held termination hearings on May 4, May 13, and June 7, 2016. At the time of the termination hearings, L.S. was eight years old. DCS had

been involved with L.S. and Mother since December 2011, and L.S. had been removed from Mother's care since March 2014.

[23] At the time of the first two hearings, Mother was living in a shelter and had been living there since April 2016. Prior to moving into the shelter, Mother had lived in her car for a short period and had also lived with friends. Mother had not maintained independent housing since March 2015. By the time of the last hearing in June, Mother was living in a motel, which was funded by her parents, and she testified that she was not allowed to return to any local shelter. Moreover, Mother was unemployed and had never obtained employment during the course of DCS's involvement with her. In fact, the last time Mother had employment was in 2002. Additionally, Mother had been on probation for a "hit and run" conviction since December 2014, and she had a pending theft charge that she was hoping would be dismissed. (Vol. 2 Tr. 250).

[24] During these hearings, Mother's service providers testified that Mother loved L.S. and had a bond with him. However, they also testified regarding their concerns with Mother's lack of consistent employment and housing and its effect on Mother's ability to effectively parent L.S. and attend to his special autism needs that required constant supervision.

[25] For example, the CASA, Ellen Schramm ("CASA Schramm"), testified that Mother was "very loving" with L.S. (Vol. 2 Tr. 162). However, CASA Schramm also testified that, since she had been assigned as the CASA for L.S. in October 2015, Mother had not been able to make the overall necessary

progress or changes to provide a stable home for L.S. CASA Schramm also testified that L.S. was doing well in his foster home and that it was in L.S.'s best interest to terminate the parent-child relationship.

[26] Additionally, FCM Stroup, who had been Mother's FCM from July 2013 to October 2014, testified that she was never concerned about whether Mother loved L.S. and that Mother "adore[d] him." (Vol. 2 Tr. 131). FCM Stroup's concern with Mother was that she had a "lack of progress despite constant services." (Vol. 2 Tr. 104).

[27] FCM Amy Shutters ("FCM Shutters"), who had been Mother's FCM from December 2011 to July 2013, testified that Mother generally participated in services during the initial part of the CHINS proceeding but that she would fluctuate between making progress and lacking motivation. FCM Shutters testified that Mother attended services but did not always benefit from them.

[28] FCM Cassandra Brubaker ("FCM Brubaker"), who had been Mother's FCM since January 2015, testified that that L.S. requires constant supervision and that Mother was not ready to have L.S. returned to her "[d]ue to [Mother's] lack of housing and financial stability and the poor decision-making of who she allows in her life." (Vol. 3 Tr. 122).

[29] Kami Hawke ("Hawke"), who had supervised Mother's visits with L.S. since August 2015, testified that Mother and L.S. were "definitely very loving towards each other" and had a "strong bond." (Vol. 2 Tr. 140). Hawke, however, voiced her concern about Mother's struggles to stay awake during

some visits and testified that, during one visit in April 2016, Mother "actually fell asleep for about 20 minutes of the visit[.]" (Vol. 2 Tr. 141).

[30]    Julia Knapp ("Knapp"), a family consultant who provided case management for Mother, testified that she had worked with Mother since July 2015 to help her meet her goals of finding employment and obtaining stable housing. Knapp testified that Mother was cooperative with services, but Knapp did not believe that Mother could care for L.S. at that time. Knapp testified that Mother was "frequently unable to really move around very much" and that her "motor skills [were] kind of slow, almost like she's tired or lethargic almost." (Vol 3 Tr. 46).

[31]    During the hearing, Mother testified that she did not have any source of income. She testified that she had relied on her parents for money for the prior two years. Mother also admitted that she had nodded off during visits with L.S. and acknowledged that L.S. required constant supervision. Mother testified that her numerous medications made her drowsy and that she sometimes had difficulty staying awake during the day. She testified that she had applied for Social Security disability based on a physical disability and mental health disability, that she had been denied, and that she was appealing that decision. She testified that her physical issues included back pain, fibromyalgia, asthma, irritable bowel syndrome, acid reflux, insomnia, and migraines and that she had been diagnosed with a personality disorder, depression, anxiety, and post-traumatic stress disorder.

[32] Following the hearing, the trial court entered a detailed order involuntarily terminating Mother's parental rights to L.S. In relevant part, the trial court concluded that the conditions that resulted in L.S.'s removal or the reasons for placement outside the home would not be remedied and that the continuation of the parent-child relationship posed a threat to the child's well-being. Mother now appeals.

## Decision

[33] Mother argues that the trial court erred by ordering the involuntary termination of her parent-child relationship with L.S. "Although parental rights are of a constitutional dimension, the law allows for termination of these rights when parties are unable or unwilling to meet their responsibility as parents." *In re A.N.J.*, 690 N.E.2d 716, 720 (Ind. Ct. App. 1997). *See also In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). The purpose of termination of parental rights is not to punish parents but to protect children. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied*.

[34] In reviewing the termination of parental rights, we will neither reweigh the evidence nor judge the credibility of witnesses. *I.A.*, 934 N.E.2d at 1132. We consider only the evidence most favorable to the judgment. *Id.* Where the trial court has entered findings of fact and conclusions of law, we apply a two-tiered standard of review. *Id.* We must determine whether the evidence supports the findings and then whether the findings support the judgment. *Id.* We will set aside a judgment terminating a parent-child relationship only if it is clearly

erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the conclusions or the conclusions do not support the judgment. *Id.*

[35] When DCS seeks to terminate parental rights, it must plead and prove, in relevant part:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services . . . .

I.C. § 31-35-2-4(b)(2)(B). These allegations must be established by clear and convincing evidence. *I.A.*, 934 N.E.2d at 1133. If the trial court "finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship." I.C. § 31-35-2-8(a) (emphasis added).

[36] Mother argues that DCS failed to prove that there was a reasonable probability that: (1) the conditions that resulted in L.S.'s removal or the reasons for placement outside the home will not be remedied; and (2) continuation of the

parent-child relationship posed a threat to the child's well-being.[2]  We note, however, that INDIANA CODE § 31-35-2-4(b)(2)(B) is written in the disjunctive. Thus, DCS was required to demonstrate by clear and convincing evidence only one of the three conditions in subsection (B).  *See Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 148 n.5 (Ind. 2005).  We will, therefore, discuss only whether there is a reasonable probability that the conditions that resulted in L.S.'s removal or the reasons for placement outside the home will not be remedied.

[37]  In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis.  *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014).  We first identify the conditions that led to removal or placement outside the home and then, second, determine whether there is a reasonable probability that those conditions will not be remedied.  *Id.*  The second step requires trial courts to evaluate a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation.  *Id.*  Habitual conduct may include parents' prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and a lack of adequate housing and

---

[2] DCS argues that Mother has waived appellate review of her challenge to the trial court's determination under INDIANA CODE § 31-35-2-4(b)(2)(B), contending that Mother did not challenge *both* the conditions remedied subsection and the threat to the well-being subsection.  While Mother's arguments on both subsections are not the epitome of completeness or detailed arguments, we decline to find that Mother has waived her appellate challenge to this statutory determination.

employment. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. The trial court may also consider services offered to the parent by DCS and the parent's response to those services as evidence of whether conditions will be remedied. *Id.* "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of her future behavior." *E.M.*, 4 N.E.3d at 643.

[38] Our review of the evidence reveals that DCS initially became involved with Mother and L.S. due to the deplorable condition of Mother's home, which was later condemned by the city and torn down. At that time, DCS worked with Mother, who was unemployed and had moved L.S. into a shelter, to place her on an Informal Adjustment program that allowed her to maintain care and custody of L.S. During the Informal Adjustment period, it became clear to DCS that L.S. needed to be evaluated for autism and needed special services. After L.S.'s evaluation, DCS arranged for L.S. to receive physical, occupational, and speech therapies. During the Informal Adjustment period and the CHINS proceeding, DCS worked with Mother to provide home-based services to assist her in obtaining housing and employment. Mother, however, was unable to sustain stable housing or obtain employment. Indeed, as of the last day of termination hearings, Mother still had no employment and no stable housing and was living in a motel that was paid for by her parents. Additionally, Mother also lacked consistency in ensuring that L.S. was getting his required therapies.

[39]     Here, the trial court concluded, in relevant part, that the conditions that resulted in L.S.'s removal or the reasons for placement outside the home would not be remedied. The trial court provided numerous, detailed findings relating to this conclusion and then summarized these findings as follows:

> [L.S.]'s involvement in the system began in December 2011. Since that time, he has been removed from Mother's care twice. The most recent removal has lasted for over two years. Mother has had approximately *four and one-half years* to accomplish the steps necessary to be reunified with [L.S.], but has made very little progress. Children cannot wait indefinitely for their parents to work toward preservation and reunification. . . . [L.S.] has waited for four and one-half years for his Mother to make progress, and he should not be expected to wait any longer.

(App. 39) (emphasis in original). The trial court did not err by concluding that that there was a reasonable probability that the conditions that resulted in L.S.'s removal or the reasons for placement outside the home will not be remedied.[3]

---

[3] Mother also challenges one finding from the trial court's fifty findings. Specifically, she challenges finding number 41, in which the trial court stated as follows:

> Mother undoubtedly loves [L.S.], and shows affection toward him. Mother and [L.S.] are clearly bonded. *However, her pattern of behavior over the past four and one-half years demonstrates that she is either unable or unwilling to provide the consistent care and attention that [L.S.] needs to be safe and healthy.* Instead, Mother has demonstrated that she primarily depends on others to take care of her needs.

(App. 37) (emphasis added). Mother challenges only the italicized sentence in finding number 41. She interprets the sentence to mean that the trial court was determining that L.S. was "harmed or injured or abandoned" while in her care, and she disputes that there was any evidence that her care ever "created any unsafe or unhealthy situations" for L.S. (Mother's Br. 20).

We, however, do not interpret the specific portion of finding number 41 as Mother does. In fact, the sentence is more of a conclusion by the trial court based on the evidence that L.S. had autism—which required various therapies and constant supervision—and that Mother—who had no employment, no consistent source of income, and no stable housing—had not always been consistent in working on skills with L.S. and getting him to his required therapies and had occasionally had difficulty staying awake during visitations. Mother does not challenge the evidence supporting this conclusion. Thus, we conclude her argument is without merit.

[40] We conclude there was clear and convincing evidence to support the trial court's decision to terminate Mother's parental rights to L.S. We reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." *Egly v. Blackford Cty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We find no such error here and, therefore, affirm the trial court.

[41] Affirmed.

Baker, J., and Mathias, J., concur.